## IN THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA,

AT THE JUNE TERM THEREOF, HELD AT WHEELING, IN
THE COUNTY OF OHIO, COMMENCING ON THE
THIRD DAY OF JUNE, 1874, AND END-
ING ON THE TWENTY-FIRST
DAY OF JULY, 1874.\*

---

## WHEELING.

### BELL'S ADMR. *v.* HUMPHREY.

#### July 17, 1874.

1874.
June Term.

Henry Bell, a resident of the county of Ohio, during his lifetime, made and published, in due form of law, his last will, which is in these words, to-wit:

"In the name of God, Amen: I, Henry Bell, of Ohio county, and State of Virginia, being of sound mind and memory, do make and publish this, my last will and testament:

*Item First*—I direct that all my just debts and funeral expenses be paid so soon after my decease as possible, out of the first moneys which shall come into the hands of my executors, from any portion of my estate ordered to be sold, real or personal. I also direct that a valuation or appraisement be made of all my personal estate, by three

---

\*Other cases decided at the June Term may be found reported in Vol. 7, West. Virginia Reports.

1874.
June Term.

Bell's Admr.
v.
Humphrey.

judicious neighbors, and, after being signed with their names, that a copy of the same be given to each of my executors.

*Item Second*—I will that all my personal estate, except my household and kitchen furniture, shall be sold at public auction, on a reasonable credit, immediately after the expiration of Thomas Creighton's lease, which will expire in September, 1840; the net proceeds of which, my personal estate aforesaid, as ordered to be sold, I will and give to my wife and children, share and share alike, the share of each child to be applied to the education thereof, under the direction of my executors.

*Item Third*—I give and bequeath unto my wife all my household and kitchen furniture, for her own use.

*Item Fourth*—It is my will and intention that all the real estate of which I shall die possessed or entitled to have, in law or equity, except my farm on which I reside, shall be sold by my executors, or the survivor of them, or the one qualifying and undertaking to act, for a fair and reasonable value, getting always the most that can be got; to be sold on a credit by instalments, as is usual in such cases, and to effectuate this, my intention, I give and devise all my real estate to which I may die entitled, as aforesaid, (except my home farm on. which I reside,) to my executors, or to the survivor, and if both do not qualify and undertake to act, as my executors, to the one so qualifying and undertaking to act, with full power and authority to sell and dispose of the same as fully as I would do if living.

*Item Fifth*—I give and bequeath the said farm, on which I now re-side, to my only son Moses and his heirs, *provided* my wife should not have another son by me; but if she has another son by me, born alive, whether before or after my death, then I will and devise the said home farm on which I now live, together with the piece or parcel of land I bought of Mary Hosack, and which Mary Hosack now occupies, to my son Moses, and such other son as my wife may have by me before or after my death, to be equally divided between them, by my executors: and I direct that my home farm and the Mary Hosack farm, be divided between my sons as follows, to-wit: a portion of the home farm be taken from and added to the Mary Hosack farm, so as to make the shares of each equal; but should my wife have no other son by me, born alive, before or after my death, then said home farm to go to my son Moses, and the Mary Hosack farm to pass to my executors, and to be sold as I have directed in regard to all my other lands; but should my wife have another daughter by me, born alive, whether before or after my death, such daughter is to have her share with the mother and the other six children, of the personal property before directed to be sold, and to have also an equal share with my other daughters.

*Item Sixth*—I will and bequeath my said home farm to my wife in lieu and instead of dower, for and during her natural life, and no

1874.
June Term.

Bell's Admr.
v.
Humphrey.

longer, with this request and direction to my wife, that she will not cultivate more of the land in indian corn than five acres in any one year, and that one hundred sheep be kept on the place annually,

*Item Seventh*—I also will and bequeath that the net proceeds of the lands, before given to my executors to be sold, be given to my daughters and divided among them, share and share alike; and after-born daughters of mine, whether born in my life or after my death, as aforesaid, to have an equal share and part with my other daughters; the proceeds of the same is to be put out at interest by my executors, on good real security, and the share of each paid to her when she is married or twenty-one years of age, as either event may happen first.

It is further my will that if any one of my daughters should die without being, or having been, married, and under the age of twenty-one years, that her, or their share, shall go to the surviving sister or sisters; and if I should have another son born alive, before or after, my death, that in case one of them dies without being married or having been married, and under the age of twenty-one years, the said home farm shall, in such case, go to the surviving son; and the Mary Hosack farm shall go to my executors or the survivor of them, or the one qualifying, and be sold as aforesaid, and the proceeds thereof be divided among my daughters then living.

If any difficulty or dispute should arise about the division or distribution of my real or personal estate, it is my desire that the same be referred for settlement and adjustment to the decision and award of three intelligent, honest and capable men.

I do make, constitute and appoint my friends, Jacob Gooding and James Vance, executors of this, my last will and testament, hereby revoking any and all former wills by me at any time made.

It is my wish that as to the real estate ordered to be sold, the court require no security from them, but that as to the personal estate they give the usual security; if, in the education of my children, what is before given for that purpose should not be enough, that the annual profits, or interest otherwise arising, may be applied to that purpose; I also charge my wife with the education of my sons—not a classical education, but only a common one, such as is common among boys of the neighborhood; I also charge the rent of the Mary Hosack farm with the education of my sons, should my wife have another son to educate.

In witness whereof, I, Henry Bell, the testator, have to this, my last will and testament, written on one sheet of paper, set my hand and seal this 26th day of October, in the year of our Lord, one thousand eight hundred and thirty-nine,

(Signed)                    HENRY BELL,  [Seal.]

The will was executed in the presence of three subscribing witnesses.

After the death of the testator, and at the February term, 1840, of the county court of Ohio county, the will was duly proven and admit-

ted to probate. On the 2nd of March, 1840, the executors named in the will duly qualified and gave bond and security as such, before the said county court, according to law.

The testator, at his death, left his widow and seven children living; and his widow had a daughter a few days after his death. The children are as follows: Margaret J., born 1822; Ann E., born September, 1824; Moses, born November, 1828; Maria L., born October, 1830; Sallie A., born August, 1833; Mary E., born May, 1836; Melvina E., born March, 1838; Henrietta V., born January 31, 1840; Margaret J., married to John Hosack, and died after she became 21 years old—leaving one child, Henry Hosack, who is still living, and is of full age; Maria L., married Lewis Powell, and died, and left but one child, who lived but a few months—her husband, the father of the child, is still living; Mary E., died at the age of 12 years: Eliza A., married Joseph F. Buchanan. Sarah A., Henrietta V., Melvina E., Moses Bell, are still living.

The parcel of land in controversy, contains forty-four acres, and is no part of the testator's home farm or the Mary Hosack farm, and it has never been sold by the executors or the survivor of them.

Before this suit was brought Jacob Gooding, one of the executors, died, and after his death ejectment was brought against the defendant Humphrey, by Vance, the surviving executor, to recover the said parcel of forty-four acres of land; Vance died during the pendency of the suit, and the suit was duly revived in the name of John D. Maxwell, administrator *de bonis non* with the will annexed, of the testator.

The testator during his life brought ejectment in the circuit court of Ohio county, against certain persons named Marlow, to recover said forty-four acres of land, which suit was pending and not finally determined, until the 8th September, 1856, when, by a decision of the court of appeals of Virginia, the judgment of the circuit court in favor of said testator's lessee, was affirmed. Soon after this decision writs of possession were issued at the instance of the executors, but never executed.

In November, 1871, Joseph H. Little bargained and sold by contract, four undivided fifths of said —— acres of land to defendant Humphrey, for $1,472, payable in instalments, and bound himself to make a general warranty deed therefor, when all the purchase money should be paid. Said Eliza A. and her husband, on the 14th day of Novem. 1868, by deed, conveyed to said Little, in consideration of one dollar, their interest in the land in controversy; and on the 21st of November, 1868, Sarah A., Melvina E. and Henrietta V. Bell, in consideration of $25, by deed, conveyed their interest in the land in controversy to said Little. Each of said last named deeds are deeds of general warranty. Plaintiff and defendant both claim title under the testator, and there is no dispute as to the testator having title to the land at his death,—HELD:

1. That the will of the testator passed to the executors a power coupled with an interest in the land in controversy; that it invested them with the fee simple estate in the land in trust to sell and pay the net proceeds, in money, to the daughters, &c., and it broke the inheritance.

2. That it was a general intention of the testator, by his will, to give money, personal estate, to his daughters, and not land in kind.

3. That the general intent of the testator has never been accomplished, nor is it impossible of accomplishment, in the sense in which such devises are usually made, so as to vest the legal or equitable estate, in fee simple, in the land, in the daughters or their descendants, or either of them, when the youngest child became twenty-one years old, or since.

4. That, on the death of Gooding, the said power coupled with an interest, as aforesaid, survived to Vance; and Vance, as surviving executor, had the right to maintain ejectment against defendant Humphrey, for the recovery of said land at, the commencement of this suit.

5. That upon the death of the surviving executor, Vance, it was competent and proper to revive the suit in the name of the administrator *de bonis non* of the testator, he being invested by law with the right to prosecute it.

6. On the death of the testator it was the right of the executors to enter upon the land and take the rents and profits.

7. The delay of the sale of the land did not divest the right of the executors to recover it in ejectment.

8. It was competent for the devisees of the net proceeds of sale, or any of them, to have filed a bill in equity, at any time, to compel a sale and the execution of the trust, according to the general intent of the testator.

9. The right the surviving executor had to the possession of the lands in controversy had not been divested at the commencement of the action of ejectment.

10. It would have been improper for the executors to have sold the land in controversy while the title thereto was controverted in the ejectment commenced by the testator during his life, and which was not determined till 1856.

11. Wills are to be construed according to the intention of the testator, but to this rule there are several well defined qualifications, among which are: *First.* The first universal qualification of the rule, is, that it is the intention of the the testator expressed in the will; and this must be judged of, exclusively, by the words of the instrument, as applied to the subject matter and the surrounding circumstances. *Second.* When the general intent of the testator

is clear, and it is impracticable to give effect to all the language of the instrument, expressive of some particular or special intent, the latter must yield to the former; but every expressed intent of the testator must be carried out when it can be. *Third.* A clearly expressed intention in one portion of the will is not to yield to a doubtful construction in any other portion of the instrument.

An appeal, operating as a *supersedeas*, by the plaintiff below, from the judgment of the circuit court of Ohio county, in a suit lately pending in said court, wherein, John D. Maxwell, as administrator *de bonis non*, with the will annexed, of Henry Bell was plaintiff, and Robert Humphrey, defendant. The judgment was entered on the 20th day of November, 1873. The other facts, together with the will of said Bell, appear in the opinion of the Court.

The Hon. Thayer Melvin, judge of said circuit court, presided at the trial in the court below.

*William Erskine* for the appellant.

*Taylor & Barr* for the appellee.

HAYMOND, PRESIDENT:

This is an action of ejectment brought and decided in the circuit court of the county of Ohio.

Henry Bell, who resided in said county, died on the 26th day of January, 1840. Before, and at, the time of his death, he was the owner of the real and personal estate mentioned and devised in the will, hereinafter set forth. Before his death, to-wit: on the 26th day of October, 1839, he made and published his last will, in due and proper form. At the February term, 1840, of the county court of the county of Ohio, the will, so made, was produced before that court and proven by two of the subscribing witnesses thereto, and ordered by the court to be recorded. The will is in these words viz:

"In the name of God, Amen. I, Henry Bell, of Ohio county and state of Virginia, being of sound and dis-

1874.
June Term.

Bell's Admr.
v.
Humphrey.

posing mind and memory, do make and publish this my last will and testament.

*Item first.* I direct that all my just debts and funeral ·expenses be paid as soon after my decease as possible out of the first moneys which shall come into the hands of my executors from any portion of my estate ordered to be sold, real or personal. I also direct that a valuation or appraisement be made of all my personal estate, by three judicious neighbors, and after being signed with their names, that a copy of the same be given to each of my executors.

*Item second.* I will that all my personal estate, except my household and kitchen furniture, shall be sold at public auction, on a reasonable credit, immediately after the expiration of Thomas Creighton's lease, which will expire in September, 1840; the net proceeds of which, my personal estate aforesaid, as ordered to be sold. I will and give to my wife and children, share and share alike, the share of each child to be applied to the education thereof, under the direction of my executors.

*Item third.* I give and bequeath unto my wife, all my household and kitchen furniture for her own use.

*Item fourth.* It is my will and intention that all the real estate of which I shall die possessed, or entitled to have in law or equity, except my farm on which I reside, shall be sold by my executors, or the survivor of them, or the one qualifying and undertaking to act, for a fair and reasonable value, getting always the most that can be got; to be sold on a credit by instalments, as is usual in such cases, and to effectuate this my intention, I give and devise all my real estate, to which I may die entitled as aforesaid, (except my home farm on which I reside,) to my executors, or to the survivor, and if both do not qualify and undertake to act as my executors, to the one so qualifying and undertaking to act, with full power and authority to sell and dispose of the same as fully as I would do, if living.

*Item fifth.* I give and bequeath the said farm on which I now reside, to my only son Moses and his heirs, provided my wife should not have another son by me, but if she has another son by me, born alive, whether before or after my death, then I will and devise the said home farm on which I now live, together with the piece or parcel of land I bought of Mary Hosack, and which said Mary Hosack now occupies, to my son Moses and such other son as my wife may have by me, before or after my death, to be equally divided between them, by my executors; and I direct that my home farm and the Mary Hosack farm be divided between my sons as follows, to-wit: a portion of the home farm to be taken from and added to the Mary Hosack farm, so as to make the shares of each equal. But should my wife have no other son by me, born alive, before or after my death, then said home farm to go to my son Moses, and the Mary Hosack farm to pass to my executors, and be sold, as I have directed as to all my other lands. But should my wife have another daughter by me, born alive, whether before or after my death, such daughter is to have her share with the mother and the other six children, of the personal property before directed to be sold, and to have also an equal share with my other daughters in my property, which in this will is given to my daughters.

*Item sixth.* I will and bequeath my said home farm to my wife in lieu and instead of dower, for and during her natural life, and no longer, with this request and direction to my wife, that she will not cultivate more of land in indian corn than five acres in any one year, and that one hundred sheep be kept on the place annually.

*Item seventh.* I also will and bequeath that the net proceeds of the lands, before given to my executors to be sold, be given to my daughters and divided among them, share and share alike; and after-born daughters of mine, whether born in my life or after my death, as aforesaid, to have an equal share and part with my other

daughters. The proceeds of the same is to be put out at interest by my executors, on good real security and the share of each paid to her when she is married or twenty-one years of age, as either event may happen first.

It is further my will that if any one of my daughters should die without being, or having been, married, and under the age of twenty-one years, that her or their share or shares shall go to the surviving sister or sisters ; and that if I should have another son born alive before or after my death, that in case one of them dies without being married, or having been married, and under the age of twenty-one years, the said home farm, shall, in such case, go to the surviving son, and the Mary Hosack farm shall go to my executors or the survivor of them, or the one qualifying, and be sold as aforesaid, and the proceeds thereof be divided among my daughters, then living.

If any difficulty or dispute should arise about the division or distribution of my real or personal estate, it is my desire that the same be referred for settlement and adjustment to the decision and award of three intelligent, honest, and capable men.

I do constitute, and appoint my friends Jacob Gooding and James Vance, executors of this my last will and testament, hereby revoking any, and all, former wills, by me, at any time, made.

It is my wish that as to the real estate ordered to be sold the court require no security from them, but that as to the personal estate they give the usual security.

If in the education of my children, what is before given for that purpose should not be enough, that the annual profits or interest otherwise arising may be applied to that purpose.

I also charge my wife with the education of my sons— not a classical education, but only a common one, such as is common among the boys of the neighborhood.

I also charge the rent of the Mary Hosack farm with

2

the education of my sons, should my wife have another son to educate.

In witness whereof, I Henry Bell, the testator, have, to this my last will and testament, written on one sheet of paper, set my hand and seal this 26th day of October, in the year of our Lord one thousand eight hundred and thirty-nine.

HENRY BELL.    [Seal.]

Signed, sealed, and delivered in the presence of us, who have subscribed in the presence of each other:

THOMAS HENDERSON,
JAMES W. CLEMENS,
EDWARD W. CARRERE."

It appears that James Vance and Jacob Gooding, the two executors named in the will, appeared before the county court of the county of Ohio, on the 2d day of March, 1840, and duly qualified and gave bond with security in the penalty of $6,000.00, the amount fixed by the county court, as executors of said will, and certificate was granted them for obtaining probate of said will, in due form; that said Bell, at his death, left his widow and seven children living, and that he had one daughter born a few days after his decease. The children are named. and were born as follows: Margaret Jane Bell, born 1822; Ann Eliza Bell, born September 17, 1824; Moses Bell, born November 22, 1828; Maria L. Bell, born October 3, 1830; Sallie A. Bell, born August 25, 1833; Mary E. Bell, born May 3, 1836; Melvina E. Bell, born March 4, 1838; Henrietta V. Bell, born January 31, 1840.

It also appears that Margaret Jane Bell was married to John Hosack, and died after she attained the age of twenty-one years, leaving one son, Henry Hosack, who is still living, and is of full age. Also that Maria L. Bell was married to Lewis Powell, and died leaving her husband, who is still living, and one child who died but a few months after her death; and that Mary E. Bell died at the age of twelve years; and that the other five children are still living.

It also appears that the land in controversy is no part of either the farm which the testator calls his home farm or of that which he calls the Mary Hosack farm; and that it has never been sold by the executors or the survivor of them ; that before the commencement of this suit Jacob Gooding, one of the executors aforesaid died; and after his death this suit was brought by Vance, the surviving executor of Henry Bell deceased, against the defendant, the said Vance having died after the commencement of the suit. During the pendency thereof, in the circuit court, afterwards, and on the 13th day of November, 1873, the death of Vance was entered of record in the cause, by the circuit court of Ohio county, and thereupon, at the same time, the cause was, by the order of said circuit court, reviewed in the name of John D. Maxwell (the present plaintiff) as administrator *de bonis non*, with the will annexed, of the estate of said Henry Bell, deceased.

It also appears that said Henry Bell, in his lifetime, brought ejectment in the circuit court of Ohio county against certain persons named Marlow, for the recovery of the tract of land in controversy in this suit, which said suit was pending and not finally determined until September 8, 1856, when by a decision of the supreme court of appeals of Virginia, the judgment rendered by said circuit court in favor of Bell's lessee · was affirmed. 13 Gratt. 527.

It further appears, that soon after the decision by said supreme court of appeals, in said case, there were writs of possession issued by direction of the executor, which were not executed by the sheriff, for some cause not appearing.

It also appears, in behalf of defendant, that on the 23d day of November, 1871, Dr. Joseph H. Little and defendant made an article of agreement whereby the said Little, of Washington county, Pennsylvania, of the first part, agreed to bargain, sell and convey to defendant (Robert Humphrey) the party of the second part "all his right, title

and interest in and to a certain piece or parcel," &c., (the tract of land in controversy) being *the undivided four-fifths* of said tract, in consideration whereof the defendant, the party of the second part, agrees and covenants to pay to the party of the first part the sum of $1,472—$800 to be paid the 1st day of December, 1871, and the remainder in instalments of $200 each succeeding year, until the whole amount be paid. "When the whole amount is paid out, the said party of the first part is to make and deliver to the said party of the second part a good and sufficient title for said interest."

It further appears that Eliza A. Buchanan, formerly Eliza A. Bell, and Joseph F. Buchanan, her husband, on the 14th day of November, 1868, by deed conveyed to said Joseph H. Little, in consideration of $1, all and singular of each and every of the interest or interests in the tract of land in controversy, "it being the interest or interests in said tract of land devised by the said Henry Bell, deceased to said Eliza Bell (now Buchanan) and her sisters Sarah A. Bell, Melvina E. Bell and Henrietta V. Bell, as will fully appear by reference to the last will and testament of said Henry Bell, registered," &c. This deed contains full covenants of general warranty.

It also appears that Sarah A. Bell, Melvina E. Bell and Henrietta V. Bell, on the 21st day of November, 1868, made a deed to said Little containing the same recitals as the deed last mentioned, and containing a grant in the following terms: "For and in consideration of the sum of twenty-five dollars to them, the said Sarah A. Bell, Melvina E. Bell and Henrietta V. Bell, aforenamed, in hand paid, by the said Joseph H. Little, the receipt whereof is hereby acknowledged, have granted, bargained, sold, assigned, released, aliened and and confirmed, and by these presents do grant," &c., "unto the said Joseph H. Little, and to his heirs and assigns, all and singular of each and every of the interests in the said beforementioned tract, piece, parcel, messuage or tract of land," (the land in controversy.) This deed also contains the

same recitals as the last named deed, as to the title of the four daughters of Henry Bell; and contains, also, the same full general warranty.

It further appears that both plaintiff and defendant claim the land in controversy under the title of Henry Bell, and neither party claims that the rightful title to the land in controversy was in any other person than said Henry Bell at his death.

The tract of land in controversy seems to contain about forty-four acres, as is shown by the plats in the cause, and is part of a larger tract conveyed by Daniel Cruger and wife to Henry Bell, by deed dated the 17th of December, 1835.

This suit was commenced on the 20th day of February, 1873, and the declaration was filed in the clerk's office of the circuit court of Ohio county on the first Monday in March, 1873.

To the plaintiff's declaration the defendant pleaded not guilty and issue was thereon joined. Afterwards, on the —— day of November, 1873, the cause was tried before a jury in said circuit court, and the facts hereinbefore stated were substantially proven before the jury sworn to try the issue joined, and the jury found a verdict for the defendant, upon which the circuit court rendered judgment against the plaintiff, and in favor of the defendant. During the trial and after the evidence proving, substantially, the facts aforesaid had been given to the jury, and before the jury retired to consider of their verdict, the plaintiff moved the court to instruct the jury as follows, to-wit: "The will of Henry Bell gives the fee simple to the executors upon a trust to sell, which title remains until such sale is made; and if the jury believe from the evidence that the real property in the plaintiff's declaration mentioned belonged to the said testator, at his death, and is no part of the land which he in his will calls the "Home Farm," and that it has never been sold by the executors or the survivor of them, or by the administrator; (the present plaintiff,)

they will find for the plaintiff:" Which instruction the court refused to give to the jury, and the plaintiff excepted to said refusal. But the court on refusing to give the instruction asked by the plaintiff, of its own motion, in lieu of instructions asked by both parties, instructed the jury as follows, to-wit: "If the jury believe, from the evidence, that the executors of the will of Henry Bell, deceased, or the survivor, never sold the premises in controversy under the provisions of the will, and that the youngest of the daughters of said Bell capable of taking under the will, had arrived at the age of twenty-one years before the institution of this suit, then the verdict should be for the defendants." To the giving of this instruction to the jury the plaintiff objected and excepted. After the jury had returned their verdict aforesaid and the court rendered judgment thereon, the plaintiff moved the court to set aside the verdict and judgment and grant a new trial, on the ground that the verdict is contrary to evidence, and that the court erred in refusing to give the instruction asked by the plaintiff, and also erred in giving the instruction it did, which motion the court refused to grant and to such refusal the plaintiff also excepted.

The plaintiff filed *three* bills of exception to the said rulings of the court which appear in the record and are designated as "bills of exception" Nos. 1, 2 and 3.

Bill of exceptions No. 1, is as to the refusal of the court to give the said instruction asked by the plaintiff.

Bill of exceptions No. 2, is as to the instruction given to the jury by the court.

Bill of exceptions No. 3, is as to the court refusing to grant a new trial of the cause.

On this state of the case it is now for this Court to determine whether the circuit court erred in any of its rulings or judgments covered by said bills of exception. There is really but one question to be determined in this cause by this Court, and that question is purely legal, and involves the construction of the will of Henry Bell, de-

1874.
June Term.

Bell's Admr.
v.
Humphrey.

ceased[*] as to the devises contained in the will touching the sale of a part of his lands by his executors and especially the land in controversy—Chancellor Kent in the 4th vol. of his able and learned Commentaries on page 320, says : "The earliest cases established the distinction that a devise of land to executors to sell, passed the interest in it, but a devise that executors shall sell, or that the lands shall be sold by them, gave ·them but a power. This distinction was taken as early as the time of Henry VI., and it received the sanction of Littleton and Coke and of the modern determinations. A devise of the land to be sold by the executors, confers a power, and does not give any interest." See also Sugden on Powers, 106–7–8–9. Powell in his Essay on Devises, first American edition at side pages 292 and 293, says : "Authorities are distinguished into two kinds, viz : First. Naked authorities. Second. Authorities coupled with an interest. A naked authority is where a man devises that his executors shall sell his lands ; or orders that his land shall be sold by his executors ; or appoints, constitutes and empowers A. and B., whom he makes executors of his last will, to sell, let, or set to sale his estate. In all these cases the executors have only a naked authority to sell, and, after the death of the testator the freehold descends to the heir, who is entitled to the profits, until the sale. But the executors may enter and make a feoffment ; and this will be a good execution of the will to convey the land to the feoffee, because he will be in by the devise." Again, at side page 301 of same work, he says : "Second. Authorities coupled with an interest. As if a man, seized of land devisable by testament, devise it to his executors to sell." See also Perry on Trusts, section 765. In 1 Carnes Cases (N. Y.) 16, Chancellor Kent in delivering the opinion of the court says : "But if a man devises his land to his executors to be sold, then there is a power coupled with an interest; for the executors, in the mean time, take possession of the land and of the profits. In this case, as the

estate, so also the trust, would survive to the surviving executor. It is the possession of the legal estate, or a right in the subject over which the power is to be exercised that makes the interest in question." In the case of *Mosby's Admr. v. Mosby's Admr.*, 9 Gratt. 590, judge Moncure in delivering the opinion of the court says: "Many nice and refined distinctions have been taken between forms of devise which have the effect of conferring a naked power, and those which have the effect of conferring a power coupled with an interest. The ordinary forms of devise are: "*First.* I devise my land to my executors to sell;" or "*Second.* I devise my land to be sold by my executors:" or "*Third.* I devise that my executors shall sell my land;" or "that my land shall be sold by my executors;" which is the same thing. The *first* form of the devise has been conceded by all to have the effect of giving an interest in the land. Lord Coke thought that the *second* form had the same effect. And Lord Hale and Hargrave thought the *third* form had also the same effect. But Sugden has clearly shown, by authority, that the opinions of Hale and Hargrave, and even of Coke, are unfounded; that all of the above forms, except the first, are appropriate to confer a power only and not an interest also." See Sugden on Powers, ch. 3, sec. 1, page 128–152." American Law Reg. (vol. 13,) May, 1874, 328. When the devise is merely a power to the executor to sell, there the heir may enter and take the profits, until the executors have sold; and after the sale the purchaser may enter on the heir. But where a power is coupled with an interest in the land, the heir can not intermeddle with it; and the executors, after the death of the devisor, may enter into the land and take the profits, and make sale according to the devise; because the devise breaks or takes away the descent and vests the estate of the land in the executor. 1st Lomax on Executors, 219.

In the absence of any express words of limitation (to heirs) sufficient to carry the legal inheritance, the estate

of the trustee would be enlarged and extended into such an estate as the nature and purpose of the trust required. Thus, where there was a devise of real estate to trustees simply (without adding any words of limitation) in trust to sell, it has been decided that the trustee would take the fee by construction. Hill on Trustees, 359. "If land is devised to trustees without the word 'heirs' in trust to sell, they must take the fee, otherwise they could not sell." Perry on Trusts, section 315.—2 Redfield on Wills, 718. In the case of *Mosby's Admr. v. Mosby's Admr.*, 9 Gratt., before referred to, the language employed in the will was : "Whenever my executors think best they shall sell my land in Buckingham county, together with all the personal estate, thereto belonging, except," &c.; still the court held, in that case, that such trusts and duties were expressed as to show that the testator intended to break the descent and that it was the duty of the executors to enter upon the lands and take the rents and profits ; that "the will does not confer a mere naked power on the executors ; but it vests in them an interest and a trust ; and it is their duty to take possession of the land and to account for the rents and profits until it is sold." The case of *Doe v. Edlin*, 4 Adol. & El., 582, was in substance this viz : The testatrix, Jane Newell, devised estates to the executor, Charles Nundy, upon trust to receive and apply the rents and profits to the use of Mary Scoolt for her life, and from and immediately after the death of Mary Scoolt, the trustee to convey the estates to such persons as Mary Scoolt should appoint by deed or will. Mary Scoolt died in the testatrix's lifetime.—The heir brought ejectment against the executor and it was *held* by the court : *First.* That the death of S. in the testatrix's lifetime was not an implied revocation of the will. *Second.* That the estate devised to N. did not lapse by reason of S.'s death, but vested in N. at the death of the testatrix. *Third.* That the estate so vested in N. was an absolute legal fee." In this last case Lord Denman delivered the opinion of the court. In

*margin:* 1874. June Term.

Bell's Admr. v. Humphrey.

3

citing this case I do not mean to be understood as assenting to, or dissenting from, all the principles there decided and expressed, in the opinion of Lord Denman, because I do not think it necessary for the proper determination of this cause; but I do think that much he says in that case is good law in this State as well as in England. The case is somewhat reviewed, with approval, in 5 Denio (N. Y.)

All the authorities seem to admit that the intention of the the testator is the prevailing consideration in applying all rules of construction. But to this rule there are several well defined and pertinent qualifications, among which are these : *First.* The first universal qualification of this rule is that it is the intention of the testator expressed in the will; and this must be judged of, exclusively, by the words of the instrument, as applied to the subject matter and the surrounding circumstances. *Second.* When the general intent of the testator is clear, and it is impracticable to give effect to all the language of the instrument. expressive of some particular or special intent, the latter must yield to the former, but every expressed intent of the the testator must be carried out where it can be. And the general intent overrides all mere technical and grammatical rules of construction. But the court cannot remodel the will in order to meet a contingency not in the mind of the testator. *Third.* In seeking for the expressed intention of the testator, his words are to receive that construction and interpretation which a long series of decisions have attached to them, unless it is very certain they were used in a different sense. *Fourth.* A clearly expressed intention in one portion of the will is not to yield to a doubtful construction in any other portion of the instrument. *Fifth.* It is a settled rule, too, in the construction of wills, that the existing punctuation is not regarded, if any change in that respect will tend to bring out and render the meaning of the instrument more obvious and unquestionable. *Sixth.* It is no valid objection to carrying out

the obvious intention of the testator, if it be not illegal or against good morals, that it is strange or unnatural, or absurd. But such construction will, if possible, be adopted as will uphold the will and bring it as near reason and good sense as practicable. *Seventh.* And the court will give some meaning to the instrument, if any can fairly be gathered from its words, with every allowable aid to construction." 1 Redfield on Wills, 2d ed. 381, 382. In the case of *Tazewell v. Smith's Admr.*, 1 Rand, 313, it was *held* that when a testator directs his real estate to be sold, and the money arising from such sale to be paid to particular persons, the interest of the legatees is a vested one, although the will may give a discretion to the executor as to the time of selling the estate;" also that "land directed to be sold is considered as money, unless an election be made to take it as land." See the opinion of judge Cabell, who delivered the opinion of the court in the case. See also upon this subject *Turner v. Street,* 2 Rand. 404; also *Siter & Price. v. McClanahan,* 2 Gratt. 280. In *Fletcher v. Ashburner,* 1 Bro. Ch. Cas., 497, the Master of the Rolls (Sir Thomas Sewell) says: "Nothing is better established than this principle, that money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are to be converted. And in *Ashby v. Palmer,* 1 Meriv, 300, the then Master of the Rolls (Sir William Grant) declares that "land once impressed with the character of money must remain so impressed until some person elects to take it in its original character as land. 2 Rob. Prac. (old) 147, 148.

In the case before us the testator, in the *fourth* item of his will, expressly states it to be his "will and intention, that all his real estate" of which he is possessed or entitled to have in law or equity, at his death, shall be sold by his executors, or the survivor of them, or the one qualifying and undertaking to act, for a fair and reasonable value, getting the most that can be got; and to effectuate

that intention he expressly devises all of his real estate (except the home farm,) to his executors, or to the survivor, "and if both do not qualify and undertake to act" to the one so qualifying and undertaking to act.

The *fifth* clause to some extent qualifies the *fourth* in case of the happening of a future event, to-wit : his wife having by him a son, other than his son Moses, before or after his death. On the birth of such son, then the home farm and the Mary Hosack farm to be divided equally, in the manner specified, by the executors, between such son and his son Moses. But it further provides that if his wife have no other son, (that is son other than Moses,) by him, then the home farm to go to his son Moses, and the Mary Hosack farm to *pass* to his executors and be sold as directed in regard to his other lands. And if his wife should have another daughter by him, he directed that such daughter should share with the mother and the other six children, of the personal property directed to be sold, and also share equal with his other daughters in his property, which by the will is given to his daughters.

The *seventh* clause provides that the net proceeds of the lands *"given"* to his executors to be sold, be given to his daughters and divided among them share and share alike. The proceeds of the sale to be put out at interest by his executors, on good real security and the share of each paid to her when she is married or twenty-one years of age, as either event may happen first—also, that if any one of his daughters should die without being, or having been, married, and under the age of twenty-one years, that her share shall go to the surviving sister or sisters—Also, that if another son should be born alive, that in case one of his sons dies without being married, or having been married, and under the age of twenty-one years, the said home farm, in such case, to go to the surviving son, and the Mary Hosack farm to go to his executors or the survivor of them, or the one qualifying, and be sold, and the proceeds thereof be di-

vided among his daughters then living. He also directs 1874.
June Term.
————
Bell's Adm'r.
v.
Humphrey. that if, in the education of his children, what is before given for that purpose, should not be sufficient, that the annual profits or interest otherwise arising may be applied to that purpose, &c.

From this, it is evident that the power devised to the executors by the testator is not a mere naked power, but is a power coupled with an interest; that the land is devised to the executors in fee-simple, in trust to be sold and the proceeds of the sale to be paid to the daughters as specified; that the devise to the executors of the land broke the inheritance, and it is plain that such was the intention of the testator.

It is, furthermore, apparent that the general intention of the testator was to give to his son or sons, land, and to his daughters, who were numerous, money and not land; that it was his general intention that the land devised to his executors to be sold, should be sold, and that the net proceeds of sale go to his daughters as stated; that the land should not be divided in kind among his daughters, but that the money arising from the sale thereof should be. It is true that he expresses the wish and directs that the proceeds of certain of the lands, including the land in controversy, should be paid to each of the daughters on their arriving at the age of twenty-one years or becoming married, which ever should first happen. But there is no express provision in the will requiring the sale of the land within any prescribed time, or directing or requiring the executors to convey the land to the daughters, or any of them, in any event or under any circumstances.

At the time the testator made his will he could not have contemplated that the land in controversy in this suit would be sold very shortly after his death, as it was then in litigation, and the right or title thereto undetermined, and the eldest of his daughters was, at that time, near eighteen years old. The suit which was pending at the testator's death about the right to this land was

not finally determined until 1856 some seventeen years after the date of the will; and sixteen years after his death. It cannot be supposed that the testator expected that the land in controversy should be sold by the executors during the pendency of the suit involving the right thereto. At the determination of the suit some of the daughters were dead, and most of those living were twenty-one years old. Very soon after the date of the will some of the daughters become married and their husbands, by such marriage, may have become invested with some rights or interests touching the interest of their wives in the devises in question, though it is not now so determined. One of the daughters married died, leaving an only child—a son, another daughter died at the age of twelve years and another married and died, as hereinbefore stated. Both the husbands, it seems, are living. The third daughter, if not married, and all the daughters living were, and those dead, if living, would have been over twenty-one years old, at the commencement of this suit. It is not claimed, or pretended by counsel, on either side of this cause, that the devisees of the proceeds of the sale of the land in question, or any person having any interest, ever made or have been allowed, properly, to make any sufficient election to take the land in lieu of proceeds of the sale, if permissible in such case, so as to vest in them the right to hold the land as against the executors. It does not appear that it is impossible to sell the land and apply the proceeds of sale according to the general intention of the testator; but it seems to me that the contrary appears. It is true that it is not, and was not, possible, at the time of the commencement of this suit, to sell the land and pay the proceeds of sale to any of the daughters at the time they became of age or married, which ever happened first. And in fact it would not have been proper for the executors to have sold the land while it was encumbered with a law suit, unless they could have sold it at its value which it is more than probable could not have been done under the circumstances.

According to the authorities I have cited, the testator having devised the title in fee simple to the executors in trust for the purposes herein shown, as I have stated, the inheritance in the land was broken and the executor or the surviving executor upon the death of the testator, became entitled to enter upon the land, take possession thereof, and rent the same and receive the rents and profits until sale made, or until their right to sell had by some competent proceeding been taken away, which does not appear to have been done in this case. It does not appear as I think, that the purposes for which the land was devised to the executors have been accomplished. If the executors unnecessarily delayed the sale or refused to make sale, it was competent for either of the devisees, or all of them, to file a bill to compel a sale and the execution of the trust according to the general intention of the testator. This was never done and the title of the executors, and their right to the possession of the land had not been divested at the commencement of this suit. According to my understanding of the intention of the testator, as disclosed by the will and the law applicable thereto, the surviving executor Vance was, at the institution of this suit, not only invested with the legal title, in fee simple, in trust, to the land in controversy, but was also entitled to demand and have of the defendant Humphrey the possession thereof. The executor Vance having died and this suit having been revived in the name of the present plaintiff, as the administrator *de bonis non* of Henry Bell, deceased, the question arises whether after the present plaintiff qualified as administrator *de bonis non*, as aforesaid he became invested under the law with the right to prosecute the suit to final determination and recover the land from what appears in the record. I think there can be no doubt upon this subject. See section one of chapter eighty-six of the Code West Virginia, Code Virginia, 1859, page 598. See also the opinion of Judge Moncure in case *Mosby's Admr., v. Mosby's Admr.*, 9 Gratt. 600.

The appellees counsel, in support of the judgment of the circuit court, has cited several authorities, which I will now proceed to notice briefly.

*First.* He cited Perry on Trusts, 730, and 4 Edwards Ch., (N. Y.:) "But even a discretionary *power* cannot be exercised after all the purposes of the power and trust have been satisfied." I think I have shown that the power devised in this case is not a mere naked power, and that all the purposes of the power and trust have not been satisfied.

*Second.* He argued, that under the will, the executors had a discretionary power as to time of sale, &c., until the purposes of the trust were satisfied ; that is, until the majority of the daughters, when the purpose having been satisfied, the discretion failed, and no power remained in the executors to sell. And, to support this proposition, he cited Perry on Trusts, 731 ; *Jackson v. Jansen,* 6 Johns. (N. Y.,) 73 ; *Sharpsteen v. Tillou,* 3 Cowen, (N.Y.) 651, and other authorities. I think I have already answered this proposition, by showing that it is not applicable to the power and interest devised by the will in question, to the executors. In the case in 3 Cowen, the power devised was a mere naked power— the inheritance was not broken, and it was held, that the objects of the testator having been, in a great measure, defeated, and his intentions in giving the power frustrated, the power itself failed, and the real estate descended to the heirs at law. But it was also *held*, in the same case, that "the purposes of a testator, in giving a power by his will to sell real estate, must be ascertained from all the provisions of the will; and the objects of the power must be considered in connection with the power itself." The devisees of the will under consideration, are, materially, different from that in the case in 3 Cowen. In the case of *Lessee of Nahum Ward v. Jacob Barrows*, 2 Ohio St. 241, the testator devised to his wife one-third of his estate, and directed that the residue be equally divided between his four children, by

name, and then says: "And should any of my said children die before they arrive at the age of twenty-one years, or without issue by lawful marriage, then their part or parts to go to the survivors or survivor, their heirs and assigns, forever ; and, should it please God, that all my above said four children should die before they become of age, that is, twenty-one years, or without having issue by lawful marriage, then my will is that my estate, both real and personal," before described, shall go "to my wife Hester, and to her heirs and assigns forever." He then appoints his executors, by name, "who are hereby authorized and empowered, at their discretion, to make sale of any real, as well as personal estate, I may have, or that may belong to me at my decease." Here was a mere naked power, and judge Ranney, in delivering the opinion of the Court, says: "It is enough for the purposes of this case, that it does not appear from any evidence given upon the trial, that the executors continued charged with any duty by the will, which remained unaccomplished, and which made a sale of the property necessary." The case of *Frazer v. Western*, 1 Barb. Ch. (N. Y.,) 240, is materially different from the case at bar, and was a naked trust. And it was decided, principally, upon the revised statutes of New York, which are, materially, different from any law we have on the subject. See the opinion of the chancellor, 238 and 239 : The case of *Jones v. Tatum*, 19 Gratt., 720, is, totally unlike this. There T. conveyed to H. B. and J. B., ninety acres of land in trust, for his wife for life, and at her death, to their children, with a power of appointment by will to the wife, which she did not make. In this case, judge Moncure says: "There seems to be a material difference between the English statute of uses and our's ; and it may be doubtful, whether our's would have the same effect as the English statute.—*Bass v. Scott*, 2 Leigh, 356. Our statute has not been judicially construed, except that in

Bell's Admr.<br>
v.<br>
Humphrey.

1874.
June Term.

Bell's Adm'r.
v.
Humphrey.

the case just cited, it was considered as not extending to a devise. If the trustees in this case had any title to the land it was a mere dry legal title, such as is described in Hill on Trustees, 316—317, marg. There was but one duty which then remained for them to perform, and that was to convey that legal title to the plaintiffs," &c.

The case of *Campbell v. Prestons*, was this: P., by her will, devised to T., certain real estate, in trust for her daughter S., the wife of F., with instructions to T., "to permit her said daughter to occupy and enjoy said property, should she prefer doing so;" and, should she survive her husband, T. "shall convey the said property in fee simple, to her and her heirs." S. was put in possession of the property, and in the lifetime of her husband, conveyed the property to H., the husband not joining in the deed; and after his death, she re-acknowledged the deed, and H. received possession of the property. H. afterwards conveyed to C., and T. brings ejectment against C. to recover the property, and the court *held:* that, "by the will of P., S. acquired at once, on the death of P., an equitable estate in fee simple, in the property, with the absolute right of possession for her own use; and on the death of her husband, to an absolute conveyance thereof to her, in fee simple, which was a breach of trust in the trustee to withhold; and she could have enforced this right at any moment after the death of her husband; that her rights passed by her deed to H., and by the deed of H. to C., who stood thereafter in the shoes of S., and he could no more be ejected at the suit of T., the trustee, than S. could before her conveyance."—22 Gratt., 396.

It is not difficult to perceive that this case is, totally, unlike the case at bar. The whole duty of the executors had not been performed, nor has the whole purpose of the devise to the executors been accomplished. The twenty-first section of chapter ninety of the Code does not apply to the case, as it appears, even if notice had been given, according to the twenty-third section, which

does not appear to have been done. What is a mere dry legal title, or estate, as applied to a trustee? "Wherever the person who is equitably entitled to any property, takes, absolutely, the entire beneficial interest, the person in whom the legal estate is vested for his benefit, may be said to be a dry trustee;" as, for instance, where the legal estate is vested in A., his heirs and assigns in trust for B., his heirs and assigns. And an estate, not originally a mere dry trust, may become so in the event; as when a mortgage in fee is paid off by the mortgagor, but no re-conveyance is executed; or where an equitable estate in fee simple, is limited in remainder to B., expectantly, upon the determination of some particular or partial beneficial estate or interest, which is afterwards determined or satisfied."—Hill on Trustees, mar. pages, 316 and 317.

In the case at bar, I have shown that it was not the intention of the testator that his daughters should take the legal estate and the legal estate was not devised to the executors in trust for them, but it was devised to the executors not that they should have the use, or receive, and enjoy the land, but to be sold by the executors, and the net proceeds of sale—money, personal estate—and not land should be received by them.

Entertaining the views I have expressed, as to the intention and purposes of the testator in devising the land in controversy to his executors and the legal character and effect of the devise, I think there is error in the judgment of the circuit court, now here in review. The instruction asked for by the plaintiff set out in bill of exceptions No. 1, would, in ordinary cases, be held to have been properly refused by the court, not because it does not propound the law correctly, in the abstract, in this case, but because of the form in which it was asked to be given. In many cases if the court were to give an instruction in the form of this instruction, it would be error, because the court in so doing would derogate from the true province of the jury as to the determination of

the facts ; but in this case, the question as presented by the evidence before the jury was purely legal in its character. It simply involved the construction of the devises in the will touching the land in controversy and their effect.

And, as I think the instruction asked by the plaintiff, propounds the law applicable to this case correctly, in substance, and the defendant could not have been prejudiced by the form in which it was asked, the court erred in refusing to give the instruction to the jury as it was asked, and erred in giving to the jury the instruction it did as set forth in bill of exception No. 2.

The verdict of the jury is contrary to the law and the evidence, and the court erred in refusing to set aside the verdict of the jury, and grant a new trial as asked by the plaintiff as set out in the *third* bill of exceptions. For these reasons the verdict of the jury rendered in this cause must be set aside and the judgment of the circuit court rendered thereon reversed and annulled and a new trial granted in the cause, and the appellant recover against the appellee his costs in this Court expended.

And this Court proceeding to render such judgment as the court below ought to have rendered, it is considered by this Court that a new trial be granted in this cause, the costs of the former trial to abide the final result of the suit, and this cause is remanded to the circuit court of the county of Ohio, for further proceedings therein to be had according to law.

The other Judges concurred.

JUDGMENT REVERSED, VERDICT SET ASIDE AND NEW TRIAL GRANTED.